IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

WILLIE DORSEY,
      Plaintiff,

v.

Civil No. 2:12cv90

AETNA LIFE INSURANCE COMPANY,
et al.,
      Defendants.

## OPINION AND ORDER

Willie Dorsey, a former executive with Cox Enterprises, Inc. ("Cox"), has brought this suit on February 22, 2012, against Cox and Aetna Life Insurance Company ("Aetna") based on the Employee Retirement Income Security Act (ERISA), seeking damages in multiple millions of dollars for long term disability benefits as well as failure to timely provide him with copies, after a request, of the Cox Executive Supplemental Plan ("CESP").

This matter is before the Court on cross-motions for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. Defendant Cox has moved for summary judgment with respect to all claims asserted against it by the plaintiff. Defendant Aetna has likewise moved for summary judgment with respect to all claims asserted against it by the plaintiff. The plaintiff has moved for summary judgment with respect to his claims against Aetna only. For the reasons set forth herein, the defendants' respective motions for summary judgment are **GRANTED** and the plaintiff's motion for summary judgment is **DENIED**.

## I. CLAIMS OF THE PARTIES

The plaintiff, Dorsey, seeks an award of benefits under Cox's long-term disability program, asserting that Aetna, a third-party administrator, improperly denied the plaintiff's claim for long-term disability benefits. Specifically, the plaintiff seeks an award of long term disability

benefits based on his alleged inability to perform his own occupation due to anxiety and depression, a declaration that he was entitled to long term disability benefits at the time of his application for benefits, which would trigger his eligibility for various other welfare plan benefits and which would affect calculation of service-year credits for retirement benefits under the Cox Pension Plan and the CESP, and an order directing Aetna and Cox to review his continuing eligibility for long term disability benefits. Second, the plaintiff seeks to recover statutory civil penalties for Cox's alleged failure to timely disclose a complete copy upon request of the Cox Executive Supplemental Plan. Third, the plaintiff seeks equitable relief with respect to a previously unpleaded equitable estoppel claim. The plaintiff has moved for summary judgment with respect to his claims for benefits and for declaratory judgment as against Aetna. The defendants have separately moved for summary judgment as to all claims against them.

## II. FACTUAL AND PROCEDURAL BACKGROUND

In 1989, Willie Dorsey, the plaintiff, joined Trader Publications, Inc., a Cox subsidiary, to serve as controller of the company. In April 1991, Cox merged Trader Publications with Landmark Target Media, a division of Landmark Communications, Inc. ("Landmark"), and Dorsey was named controller of the new joint venture, entitled Trader Publishing Company. Cox and Landmark were two of the largest privately held media companies in the United States, each with numerous subsidiaries employing thousands in cable, TV, radio, newspapers, and private periodicals of all types throughout the United States. Cox has its headquarters in Atlanta, Georgia, and Landmark had its headquarters in Norfolk, Virginia.

Dorsey relocated from Trader Publications in Clearwater, Florida, to Norfolk in 1991 to take on this new role at Trader Publishing Company, and he was later promoted to the position of Vice President and Controller of Trader Publishing Company. Dorsey's duties there included

overseeing all financial aspects of the company, including preparation of financial statements, annual budgets, reporting to Cox, and reporting income taxes and other related taxes; he was also responsible for all accounting systems used in Norfolk, and for other projects as assigned.

In September 2006, Cox and Landmark dissolved the joint venture, splitting the assets between them, including various classified advertising titles focused on boats, automobiles, motorcycles, trucks, and other advertising features. Over its fifteen year history, Trader Publishing Company had grown into one of the largest companies headquartered in the Hampton Roads area of Virginia, earning more than $1.2 billion in annual revenue for print and online classified advertising services, with more than 10,000 employees—including 1,000 in Norfolk and Virginia Beach—and more than 300 offices nationwide. At the time of the split, Trader Publishing Company was headquartered in a seven-story office building it owned in downtown Norfolk, Virginia, and it also owned a 20-story, 500,000 square foot skyscraper under construction nearby, the ownership of which was taken by Dominion Enterprises ("Dominion"), the Landmark-owned successor as a result of the split of Trader Publishing Company. Following the split, Cox, through a company called Cox AutoTrader/AutoMart ("CATAM"), took ownership of more than 300 of Trader's automotive classified advertising publications, while Landmark, through Dominion, took ownership of nearly 500 publications and websites serving the real estate, apartment, employment, and recreational classified advertising markets.

As part of this transaction, Dorsey was rehired by Cox and appointed Chief Financial Officer ("CFO") of CATAM, the Cox-owned successor to Trader Publishing Company, which dealt with printed automotive classified advertising publications. Dorsey was the top executive of CATAM in the company headquarters, which was in Norfolk, Virginia. The controller of the company, its accounting systems manager, and the office manager, as well as eighty indirect

subordinates, reported to Dorsey in Norfolk. Dorsey himself reported only to Joe George, who held the title of President of CATAM. However, George was also head of several other Cox subsidiaries and was located in Atlanta, Georgia, Cox's headquarters, while CATAM was located in Norfolk, Virginia.

The plaintiff claims that Aetna, the claim administrator, incorrectly denied the plaintiff's claim for long term disability benefits. The Court will therefore begin with the history of the plaintiff's condition, while trying to present this matter in a chronological order with respect to what happened and when.

### Medical and Administrative Background

After the split of publications between Cox and Landmark, CATAM began to suffer from the changing landscape of used automobile marketing as advertising moved from paid placement in paper publications to free or inexpensive online ads on AutoTrader.com, Craigslist and other websites. In February 2008, CATAM laid off approximately sixty employees in Norfolk. Sometime during the first half of 2008, George and Dorsey began discussing the lessening in size and relocation of CATAM operations from Norfolk to Atlanta.

On June 17, 2008, as the market was declining, Dorsey suffered what he alleges to have been an anxiety attack while at work. At the time, he advised others at work that he thought he was having a reaction to paint fumes present at the office. Dorsey subsequently left work and went to see his primary care physician, Dr. Zhang. A.R.[1] 417–18.

On June 17, 2008, Dorsey went to Dr. Zhang with complaints of increased stress levels

---

[1] "A.R." refers to the administrative record submitted as Attachment D to Aetna's motion for summary judgment. ECF No. 52. The parties have agreed that this is a complete and accurate copy of the administrative record before the third-party claims administrator at the time of its decision to deny the plaintiff's application for long-term disability benefits, both initially and on administrative appeal.

and fatigue. A.R. 417. He denied having feelings of hopelessness or helplessness, and he denied any suicidal ideation. Id. Dr. Zhang diagnosed Dorsey with fatigue, possibly related to poor sleep or depression, and with anxiety. Id. For the anxiety, Dr. Zhang prescribed Paxil (10mg daily) and Lorazepam. Id. Dr. Zhang advised Dorsey to return for a follow-up appointment in a week. Id.

On June 18, in relation to George having indicated that CATAM would move to Atlanta, Dorsey spoke to George about his health and to tell him that he wanted to remain in Norfolk rather than move to Atlanta. They conversed regarding Dorsey's continued employment with Cox, in light of the decision to eliminate his position in Norfolk. Dorsey expressed his interest in moving to a "lesser position within Cox." Dorsey Dep. Ex. 1, Sept. 26, 2012, ECF No. 46. George promised to look for a role in which Dorsey could continue to operate accounting operations in Norfolk, while Dorsey's subordinate, Scott Miller, moved to Atlanta to set up accounting operations there, in place of Dorsey, since Dorsey wanted to remain in Norfolk. If George was unable to find a new role for Dorsey in Norfolk that fit, he told Dorsey that Cox would provide him with a "stay bonus" and severance package at the end of the summer in 2009, "[u]nless business really tanks which I hope doesn't happen." Id.

On June 25, 2008, Dorsey wrote to George to request authorization to take more than the usual amount of vacation time over the summer to help him recuperate from stress he had suffered over the previous two to three years of intense activity at CATAM and Trader Publishing Company. On June 26, 2008, George approved Dorsey's request for three weeks of vacation in July and August, plus a few extra days around the Thanksgiving and Christmas holidays.

On July 28, 2008, forty-one days after his initial visit, Dorsey went to his primary care

physician for a follow-up visit, this time seeing Dr. Zhang's partner, Dr. Balderston. A.R. 415–16. Dorsey reported to Dr. Balderson that he had recently returned from a two-week vacation. A.R. 415. He also reported having had another panic attack while on his medication. Id. Dorsey stated that he was worried about his job. Id. Dr. Balderston instructed Dorsey to continue on his medication, increasing his Paxil dosage to 20mg daily. Id. She also advised Dorsey to "work on stress reduction." Id.

On August 4, 2008, shortly after Dorsey returned from vacation, he and George had another conversation, in which Dorsey expressed that, upon further reflection, he thought his best option would be to terminate with severance when his position was eliminated, take two to three months off to rest, and then apply for other positions, both at Cox and elsewhere. Later that month, Dorsey and George spoke again, with George advising Dorsey that, in light of rapidly declining business conditions, the company had decided to accelerate the elimination of Dorsey's position from summer 2009 to December 31, 2008. George outlined the terms of the severance package being offered by Cox: if Dorsey signed a separation agreement and release and continued to meet performance standards through his termination date, he would be eligible for 44 weeks of severance pay and continued medical, dental, vision, and life insurance benefits, as well as an annual performance bonus for 2008 and assistance from an outplacement services provider.

On September 3, 2008, thirty-seven days after his prior visit to a physician, Dorsey went to Dr. Zhang again. A.R. 344–45. Dorsey reported that he still felt some anxiety, and that he had continued to suffer panic attacks about once per day. Id. He also reported feeling depressed "occasionally." Id. Dr. Zhang increased Dorsey's Paxil dosage from 20mg to 30mg daily. Id.

Four days later, on September 8, 2008, Dorsey returned to Dr. Zhang with complaints of

a migraine headache that had lasted four to five days, ever since increasing his Paxil dosage to 30mg daily. A.R. 342–43. Dr. Zhang instructed Dorsey to continue taking a 30mg dose of Paxil daily, along with Tylenol as needed for the headaches, and if there was no improvement within two weeks, Dr. Zhang would consider switching medications. Id.

On September 10, 2008, Dorsey met for an initial evaluation with Dr. Guanzon, a psychiatrist. A.R. 274–79. Dorsey presented with complaints of anxiety attacks, light-headedness while at a meeting, dizziness, and being "frozen" for two minutes during a recent conference call. A.R. 274. Dorsey denied any suicidal or homicidal ideation. A.R. 278. Dr. Guanzon observed that Dorsey exhibited a depressed and anxious mood or affect, but that he was alert to time, person, place and situation, and his thought stream was logical and sequential. A.R. 277. She assessed his intellect as "above average," his remote and recent memory as "adequate," and his judgment as "adequate," but, in observing his attention and concentration, she found Dorsey to be "distractible." A.R. 278. Dr. Guanzon diagnosed Dorsey as suffering from general anxiety disorder and attention-deficit disorder, with a current Global Assessment of Functioning ("GAF") rating of 60, indicating moderate symptoms (e.g., occasional panic attacks) or moderate difficulty in social or occupational functioning.[2] Id.; see also American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders: DSM-IV-TR 34 (4th ed., text revision 2000).

On September 15, 2008, according to Dorsey, he suffered another panic attack while at work. He left work on short-term disability, and he did not return before he was terminated effective December 31, 2008.

---

[2] GAF scores are "used to report the clinician's judgment of the subject's overall level of functioning." Pryor v. Astrue, 650 F. Supp. 2d 493, 496 n.2 (W.D. Va. 2009) (citing DSM-IV-TR 34).

On September 16, 2008, Dorsey went to Dr. Zhang with complaints regarding increased stressors at work. A.R. 267. Dorsey told Dr. Zhang he took leave from work "to get himself together." Id. He reported "feel[ing] stress from work [and] feel[ing] depressed." Id. He denied feeling "helpless/hopeless," and he denied any suicidal ideation. Id. Dorsey reported having a normal appetite, but sleeping only four to five hours per night. Id. He complained of continued headaches, so Dr. Zhang reduced Dorsey's dosage of Paxil from 30mg per day to 20mg per day. Id. Dr. Zhang diagnosed Dorsey with depression and anxiety and referred him to a psychiatrist, apparently unaware that Dorsey had already met with Dr. Guanzon. Id.

On September 17, 2008, Dr. Guanzon completed a Cox Auto Trader Certification of Serious Health Care Condition form. A.R. 348–49. Dr. Guanzon certified Dorsey's condition as a "Serious Health Condition" under the Family and Medical Leave Act of 1993, based on Dorsey's complaints of suffering "anxiety attacks consisting of light-headedness [and] dizziness," Dorsey's "history of syncope," and an incident in which Dorsey reported a "frozen feeling." A.R. 348. Dr. Guanzon certified that the condition commenced mid-June 2008, and estimated that it would continue for twelve weeks. Id.; see also A.R. 363 (Dorsey Aff. ¶ 4, Dec. 1, 2009 ("I was initially scheduled to be out for three months and return to work on December 10, 2008.")). Dr. Guanzon also certified that, in her medical opinion, Dorsey was "unable to perform work of any kind." A.R. 348.

On September 24, 2008, Dorsey went to Dr. Guanzon for a routine visit. A.R. 273. Dorsey reported being anxious, and still having occasional dizzy spells. Id. He reported having a "panic attack just from thinking [regarding] work—company relocating to Atlanta." Id. Dr. Guanzon continued Dorsey on his existing treatment goals without modification, to return to care as needed. Id.

On November 5, 2008, Dorsey returned to Dr. Guanzon for a routine visit. A.R. 272. He reported still having "[occasional] shakes when driving." Id. Dr. Guanzon continued Dorsey on his existing treatment without modification, including Paxil at the lower dosage of 20mg per day, and advised him to return to care within two or three months. Id.

Rather than waiting two or three months, on December 3, 2008, Dorsey returned to Dr. Guanzon. A.R. 271. At this visit, Dr. Guanzon completed a Cox Auto Trader Work Evaluation / Status Report form provided to her by Dorsey. A.R. 350–51. Dr. Guanzon stated her medical opinion that Dorsey was "unable to work in any capacity" at the time, and she anticipated that he would be able to return to work with restrictions by March 2009. A.R. 350; see also A.R. 363 (Dorsey Aff. ¶ 5, Dec. 1, 2009). Nevertheless, Dr. Guanzon's December 3, 2008, treatment notes indicate that Dorsey was "physically fine now[,] not as tired," and she also noted, somewhat cryptically: "reading," "panic attacks," "ice cream," and "tickets." Id. Dorsey told her that someone had said to him that he was "a heart attack waiting to happen." A.R. 421. Dr. Guanzon continued Dorsey on his existing treatment goals without modification, to return to care as needed. A.R. 271.

On December 8, 2008, Dorsey went to Dr. Zhang, his primary care physician, with complaints of neck pain, swelling, and a sore throat. A.R. 265. In examining and treating Dorsey for his physical complaints, Dr. Zhang noted that Dorsey was alert and oriented to person, place, and time, and that he exhibited normal judgment and insight, normal memory, and normal mood or affect. A.R. 266.

On December 31, 2008, the last day of Dorsey's employment with CATAM, George wrote to reiterate the "special severance package" offered by Cox on August 28, 2008, and to advise Dorsey that a formal agreement was forthcoming under separate cover. On January 8,

2009, George sent Dorsey a letter agreement by overnight courier setting forth the specific terms of the offered severance package, as promised. By its terms, the severance offer to Dorsey expired on the forty-sixth day after his receipt of the letter agreement.

On January 21, 2009, Dorsey went to Dr. Guanzon for a visit. A.R. 270. Dr. Guanzon noted that Dorsey's job had ended on December 31, 2008, while he was on sick leave. Id. Dr. Guanzon continued Dorsey on his existing treatment goals, without modification. Id.

On February 1, 2009, Dr. Guanzon provided Dorsey with a letter addressed to "To Whom It May Concern," intended to assist him in his application for disability benefits. A.R. 421. Dr. Guanzon's letter summarized Dorsey's treatment history and diagnosis, and it described Dorsey's status as of his most recent office visit:

> The prescribed antidepressant and anti-anxiety regimen did not provide the expected remission of symptomology consisting of palpitations, panic attacks, light headedness, overwhelming feelings of worthlessness and helplessness, anergy, amotivation and sleep difficulties. At some point, this formerly energetic, hard working, driven husband and father was reduced to home-bound status and unable to stay connected with his family and friends. He has recently been described to be "a heart attack waiting to happen."

Id. Evidently, Dorsey had retold to Guanzon what he had first told the psychiatrist on December 3, 2008, concerning what someone else had allegedly told him. Dr. Guanzon closed her letter with an offer to assist in any way necessary. Id.

On February 16, 2009, Dorsey submitted an application for long-term disability benefits to Aetna, claims administrator under the Cox Welfare Benefits Plan. A.R. 220–21. He identified September 14, 2008, as his date when he first missed work due to a disability, and he indicated that his "return date [was] undetermined." Id. Dorsey described the nature of his disability as general anxiety disorder and major depressive disorder. Id. In particular, Dorsey reported that he was "unable to concentrate on tasks," that he "get[s] very anxious continuously," and he was

"unable to deal with stressful situations – gets dizzy & light-headed." Id.

On February 25, 2009, Dorsey's attorney, Ann Sullivan, wrote to Thomas Martinchek, an in-house attorney at Cox, regarding the severance package offered to Dorsey.[3] On February 27, 2009, Martinchek replied by e-mail, responding to several questions she had posed, and extending the time for Dorsey to consider the severance offer until March 4, 2009. Martinchek attached a revised severance agreement to his email, apparently addressing certain of Sullivan's concerns with regard to Dorsey's eligibility for long-term disability benefits if he accepted the severance agreement. Dorsey chose not to enter into a severance agreement with Cox.

On March 4, 2009, Dorsey met with Dr. Guanzon for twenty to thirty minutes while she "filled out disability forms." A.R. 269. First, Dr. Guanzon completed an Aetna Attending Physician Statement, documenting her diagnosis and treatment of Dorsey. A.R. 236–37. On the form, she indicated that, for medical reasons, Dorsey needed to be absent from work due to a disability beginning on September 10, 2008. A.R. 236. She confirmed her diagnosis of general anxiety disorder, major depressive disorder, and attention deficit disorder. Id. She documented Dorsey's related prescription medications: "Wellbutrin SR 200mg [twice daily,] Paxil 20mg daily[,] Lorazepam 2mg [twice daily]." Id. Dr. Guanzon characterized Dorsey's treatment as "continuing medication management," with office visits "as needed." Id. She reported initial symptoms of anxiety and depression as having occurred on June 17, 2008. A.R. 237. Evaluating Dorsey's abilities and limitations, Dr. Guanzon found him "[c]ompetent to endorse checks and direct the use of proceeds thereof," but not "[a]ble to work with others," "[a]ble to give supervision," or "[a]ble to work cooperatively with others in group setting." Id. She opined that Dorsey had "[n]o ability to work" due to "[s]evere limitation of functional capacity; incapable of

---

[3] Sullivan's February 25, 2009, letter is not in the Court's record, but the substance of that letter does not appear to be material.

minimal activity." Id. She documented no specific restrictions or limitations, except for a general statement that Dorsey was "severely limited." Id. Dr. Guanzon responded "undetermined" when asked to provide an estimated return to work date. Id. When asked to report "[o]bjective findings that substantiate impairment (current laboratory, physical and/or mental status examination, and other testing)," Dr. Guanzon responded: "Mental status as of 3-4-09: Depressed; amotivated; anxious; not suicidal." Id. Dr. Guanzon reported Dorsey's current status as having "regressed" since beginning treatment, noting further than vocational rehabilitation was contraindicated due to "anxiety/depression; not in remission." Id.

Dr. Guanzon also completed an Aetna Attending Physician Behavioral Health Statement form that day. A.R. 239–40. She reported a primary diagnosis of general anxiety disorder and major depressive disorder, with a secondary diagnosis of attention-deficit / hyperactivity disorder, inattentive type. A.R. 239. She noted Dorsey's subjective symptoms and complaints: "anxious, depressed; light-headed; dizzy." Id. Where the form requested "Objective findings (include mental status findings, testing results, rating scales, etc.)," Dr. Guanzon disclosed the following: "tremulous[,] sweaty[,] can't stay put[,] unable to focus[,] [decreased] concentration[,] [decreased] attention." Id. Dr. Guanzon assessed Dorsey's abilities and limitations, finding that he was "capable of signing checks and directing the proceeds," but he had marked limitations on his ability to "work cooperatively with others in group settings," "maintain persistence to task," "work alone or in physical isolation from others," or "attain set standards and limits," and he was completely unable to perform the following: "[f]ollow work rules"; "work with others"; "give supervision to others"; "maintain attention and concentration"; "interact with superiors" or "with public/customers"; "use judgment and make decisions"; and "direct, control or plan activities of others." A.R. 240. When asked to provide her objective

findings to substantiate impairment, Dr. Guanzon responded: "mental status examination as of 3-4-09[:] anxious, tremulous, impending sense of doom; frustrated; unable to focus / concentrate." Id. With respect to activities of daily living, they only restriction imposed was "can not drive alone, needs consistent prompting & encouragement." Id. Two months after terminating his employment, Dr. Guanzon reported Dorsey's current status as "[r]egressed," and she opined that vocational rehabilitation was contraindicated because Dorsey's "anxiety / subsequent depression has not remitted." Id.

On March 5, 2009, Dorsey went to Dr. Balderston for the completion of disability forms. A.R. 263. In her treatment notes, Dr. Balderston noted that Dorsey had reported having suffered anxiety or panic attacks on three occasions in June, July, and September 2008.[4] Id. Following the June attack, Dr. Zhang diagnosed Dorsey with anxiety, depression, and mental exhaustion, and treated with prescription medications. Id. Beginning in mid-September, Dorsey had gone on medical leave from work pursuant to the instructions of Dr. Guanzon. Id. Dorsey reported feeling okay "most of the time," but not when stressed. Id. Balderston diagnosed Dorsey with general anxiety disorder and depression, noting that "when working[,] he is light headed / dizzy[,] not concentrating." Id.

Dr. Balderston also completed an Aetna Capabilities and Limitations Worksheet that day. A.R. 219. Dr. Balderston reported Dorsey's diagnosis of general anxiety disorder, major depressive disorder, and attention deficit disorder. Id. She indicated that he was prescribed the following medications: "Paxil 20 mg, Wellbutrin 200mg [twice daily], Lorazepam [as needed]." Id. Dr. Balderston reported no physical restrictions for Dorsey, except that he must be accompanied while operating a motor vehicle. Id. Dr. Balderston assessed Dorsey's limitations,

---

[4] This was different from what Dr. Zhang had been told on September 3, 2008, when Dorsey stated that he had suffered panic attacks about once per day.

noting that Dorsey was indefinitely limited to speaking "zero" hours per day and working "zero" hours per day. Id. She provided these additional comments in the space provided: "Patient does not have a physical occupation. At this time he is unable to work due to severe depression and anxiety disorder. These make him unable to concentrate, focus, panicky, dizzy, tremulous, sleepy. Followed by Psychiatry." Id.

On March 31, 2009, Aetna received a formal job description for Dorsey's former position as CFO of CATAM. A.R. 245–47.

On April 2, 2009, Dr. Guanzon completed an Aetna Behavioral Health Clinician Statement. A.R. 256–60. In this statement, she confirmed that she had recommended to Dorsey on September 10, 2008, that he stay home from work, and in a space for reporting her rationale for recommending disability leave, she wrote: "anxiety attacks[;] 'frozen' x 2 minutes during a conference call[;] light-headedness[;] [decreased] focus / attention / concentration." A.R. 256.

In assessing Dorsey's cognitive functioning, Dr. Guanzon wrote that Dorsey was able to write a sentence from her dictation only "slowly" and "hesitantly." Id. Likewise, he was able to follow a three step command only "slowly" and "hesitantly." Id. He was unable to read a narrative paragraph from a magazine or newspaper and report the main concept or idea of the passage. Id. Dorsey failed a serial-sevens test, in which he was asked to count down from 100 by sevens to test his ability to concentrate, responding "100 – 96 – 89 – 75 – 70." Id. During her examination of Dorsey, Dr. Guanzon found that he exhibited applied focus and concentration for periods of less than five minutes. Id. She noted that he was unable to respond to direct questions appropriately because he was "too distractible [and] fidgety," displaying diminished focus and attention. Id. Dr. Guanzon found Dorsey's reasoning and judgment to be within normal limits, she observed no delusional ideation, and Dorsey reported no hallucinations. Id.

In assessing Dorsey's emotional functioning, Dr. Guanzon found his emotional state during examination to be "depressed, irritable, [and] fidgety," but he displayed "mood-congruent affect." Id. Dr. Guanzon found Dorsey unable to spontaneously compose himself, noting that he needed reassurance and redirection to do so. A.R. 258. She noted that Dorsey reported having experienced a panic attack prior to showing up for his appointment, during which he felt "shaky, sweaty, light-headed, [and] dizzy." Id. Dr. Guanzon did not document the frequency of Dorsey's panic attacks in the space provided, but she noted that Dorsey reported their duration as "variable," but generally five to ten minutes long. Id. During the exam, Dr. Guanzon observed Dorsey's behavior, noting that he appeared "tremulous[,] irritable[,] and fidgety." Id. She found his psychomotor activity and ability to apply effort to be impaired, based on his "tremulous" state, his "needing reassurance and redirection," and his "heavy breathing." Id. Dr. Guanzon observed Dorsey's inappropriate dress and hygiene during the exam, noting that he appeared "unkempt [and] disheveled," and he was "unable to initiate and maintain eye contact." Id.

Dr. Guanzon characterized her treatment of Dorsey as "medication management" on an "as needed" basis, with his next appointment scheduled for two weeks after the exam. A.R. 259. She documented her diagnosis of general anxiety disorder and attention-deficit / hyperactivity disorder, with a current GAF rating of 60, indicating moderate symptoms or moderate difficulty in social or occupational functioning. Id.; see also DSM-IV-TR, at 34. Dr. Guanzon found Dorsey "[u]nable to return to work at this time," and projected his return to work one year later, in April 2010. A.R. 260.

Pursuant to Dorsey's application for long-term disability benefits, submitted to Aetna as the third-party claims administrator under the Cox Welfare Benefit Plan, which plan will be discussed later in this opinion, Aetna referred Dorsey's claim to a psychologist for a peer review.

On May 11, 2009, Dr. Elana Mendelssohn, Psy.D., completed an Aetna Physician Review report. A.R. 561–64. Dr. Mendelssohn reviewed and commented upon Dr. Guanzon's treatment notes and examination findings in great detail. A.R. 562. She considered all the clinical evidence and concluded that Dr. Guanzon's detailed examination findings on March 4, 2009, and April 2, 2009, supported a finding of functional impairment from March 4, 2009, to the present (May 11, 2009), but that the medical records submitted for review failed to support a finding of functional impairment during the time period September 15, 2008, through March 3, 2009. A.R. 563. Dr. Mendelssohn's report provided her rationale in support of this conclusion:

> In reviewing the provided clinical information, the claimant was initially seen by a psychiatrist a few days prior to his first date of absence. At that time, he reported suffering a panic attack while at work. Mental status findings from the claimant's initial evaluation noted that he was sad, worried, and anxious. However, more specific examination findings were not provided to ascertain the presence of impairment in psychological functioning. It was also noted the claimant was distractible; however, the claimant's treating provider did not include specific examples to substantiate cognitive dysfunction. Subsequent Office Notes from the claimant's treating psychiatrist primarily included self-reported complaints as opposed to examination findings and behavioral observations. However, the claimant's treating psychiatrist subsequently completed documentation on 03/04/09 and 04/02/09 noting that the claimant presented as unkempt and disheveled, tremulous, irritable, and fidgety. It was also noted he had difficulty with cognitive tasks secondary to distractibility, reduced focus, and compromised attention. It was noted the claimant required reassurance and redirection to compose himself and had difficulty initiating and maintaining eye contact. Based on these specific findings and observations, it is my opinion that the information supports the presence of a functional impairment from 03/04/09 to present; however, documentation from 09/15/08 to 03/03/09 did not include clear description of direct and observed behaviors to corroborate the presence of impairment in cognitive, emotional, or behavioral functioning.

Id.

On May 12, 2009, an Aetna claims analyst wrote to Dr. Guanzon, attaching a copy of Dr. Mendelssohn's report and requesting Dr. Guanzon's comment on Dr. Mendelssohn's assessment. A.R. 285–86. If Dr. Guanzon disagreed, she was asked to provide any further medical

information or objective medical explanation. Id.

On May 14, 2009, Dorsey went to his primary care physician, Dr. Balderston, with complaints of consistent headaches. A.R. 326–27. Dr. Balderston noted that Dorsey reported difficulty thinking, and she diagnosed him with tension headaches, as well as anxiety disorder and depression. Id. She also wrote Dorsey a prescription note, addressed to "To Whom It May Concern," advising the reader that Dorsey suffered from chronic headaches, dizziness, and fatigue; that he has been diagnosed with disabling anxiety and depression; and that, finding no physical basis for headaches, Dr. Balderston consider them to be tension related. A.R. 328.

On May 20, 2009, Dorsey went to Dr. Guanzon for a routine visit. A.R. 298. Dr. Guanzon recorded the following observations regarding Dorsey: "mood – depressed; no eye contact[;] soft voice, amotivated affect – congruent with mood[;] appearance – unkempt; stressed thought content[;] unshaven; heavy sighing[;] anxious about any mention of work." Id. Dr. Guanzon noted that Dorsey "insists on neurological clearance 'to find out what is physically wrong with me,'" and that he "report[ed] interrupted sleep." Id. Dr. Guanzon also responded to Aetna's May 12 letter by faxing a handwritten note: "I continue to see Mr. Willie Dorsey . . . on a once-a-month basis for medication management. Mr. Dorsey continues to be incapable of [return-to-work] status even as of today's mental status exam. He was driven to the office today by his wife, Mrs. Peggy Dorsey." A.R. 324. Copies of Dr. Guanzon's May 20 treatment notes and Dr. Balderston's May 14 treatment and prescription notes were also forwarded as attachments in support of Dr. Guanzon's handwritten response. Id.

The new medical information provided by Dr. Guanzon was referred to Dr. Mendelssohn for an addendum to her earlier report. A.R. 140–41. On June 4, 2009, Dr. Mendelssohn completed a supplemental Physician Review report, addressing the new medical information

provided by Dr. Guanzon, as well as an April 8, 2009, phone conversation between Dorsey and the claims analyst assigned to his case. A.R. 565–68. Based upon her review of this additional information, Dr. Mendelssohn concluded that the exam findings of record still failed to support a finding of functional impairment during the time period September 15, 2008, through March 3, 2009. A.R. 567. In particular, she explained:

> Newly submitted documentation did not pertain to the claimant's clinical status prior to 03/09. Due to the changeable nature of psychological conditions, current information would not necessarily reflect the claimant's clinical status for the time frame under review. Therefore there continues to be a lack of findings and observations to substantiate the presence of a functional impairment from 09/15/08 to 03/03/09.

Id. Based on Dr. Mendelssohn's analysis of the medical evidence of record, Aetna denied Dorsey's claim for long-term disability benefits by letter dated June 5, 2009. A.R. 312–16.

On June 26, 2009, Dorsey saw Dr. Balderston for a follow-up visit after having been treated at a hospital emergency room two weeks earlier. A.R. 331. Dorsey reported suffering a possible anxiety attack suffered while en route to Jacksonville, Florida, by airplane. Id. While in flight, Dorsey felt nauseated, suffered a cold sweat, and vomited. Id. After his arrival in Florida, he was taken to a hospital emergency room, where medical imaging revealed a non-obstructive kidney stone. Id. The next day, he suffered further nausea and diarrhea. Id. Based on his prior experience with kidney stones, Dorsey did not feel the symptoms were the result of kidney colic. Id. Two nights later, Dorsey experienced another panic attack while still in Florida. A.R. 364 (Dorsey Aff. ¶ 14, Dec. 1, 2009). In her assessment, Dr. Balderston simply noted that Dorsey had a history of gastroenteritis. A.R. 331. He was also treated for an unrelated tick bite and tested for Lyme disease. Id.

On November 18, 2009, Dr. Guanzon completed a Supplemental Functional Assessment (Behavioral Health) form. A.R. 358–60. Dr. Guanzon reiterated her diagnosis of general

18

anxiety disorder, major depressive disorder, and attention-deficit disorder, with an initial GAF rating of 60 effective September 10, 2008, and a current GAF of 50, indicating serious symptoms or serious impairment in social or occupational functioning. A.R. 358; see also DSM-IV-TR, at 34. Dr. Guanzon indicated that her current psychiatric diagnosis was acute, rather than chronic, and that it was precipitated by increased stress at work over a three-year period, including three-years of increased overtime and working with a "bad boss." A.R. 358. Dr. Guanzon described Dorsey's most prominent psychiatric symptoms: "Anxious, panic attacks, palpitations, dizziness, light-headedness." Id. She noted that Dorsey has responded well to treatment, which included therapy and medication management, exhibiting a decrease in panic attacks and avoiding hospitalization. Id. Dr. Guanzon characterized Dorsey's psychiatric disorders as "moderately severe." Id. She found moderately severe impairment, significantly affecting his ability to function, of Dorsey's ability to comprehend and follow instructions, his ability to perform simple and repetitive tasks, his ability to maintain a work pace appropriate to workload, his ability to perform daily activities (e.g., attend meetings, socialize with others, attend to personal needs), his ability to perform work where contact with others will be minimal, and his ability to perform tasks involving even minimal intellectual effort. A.R. 359. She found severe impairment, or extreme impairment of his ability to function, of Dorsey's ability to perform intellectually complex tasks requiring higher levels of reasoning or quantitative or language skills, his ability to relate to other people beyond giving and receiving instructions, his ability to influence people, his ability to accept and carry out responsibility for direction, control and planning, his ability to respond appropriately to supervision, his ability to perform varied tasks, his ability to make independent judgments, his ability to supervise or manage others, and his ability to perform under stress or situations where working speed and sustained attention are fundamental to the

job. Id. Dr. Guanzon attributed Dorsey's functional impairments to "anticipatory anxiety," noting that Dorsey was "worried all the time," and that he suffered "unrelenting panic attacks"; she also noted his recent trip to a hospital emergency room on June 8, 2009. A.R. 360. Dr. Guanzon could not estimate Dorsey's return-to-work date, characterizing it as "undetermined," but she provided a prognosis date for return to work of three to six months. Id. Dr. Guanzon further opined that, even upon reinstatement as an active worker, Dorsey would be unable to perform the same job, whether at Cox or elsewhere. Id.

On December 9, 2009, an Aetna claims analyst wrote to Dorsey's attorney in response to Dorsey's submission of additional information in support of his long-term disability claim, declining to reverse Aetna's June 5, 2009, decision denying disability benefits. A.R. 366. The letter also noted that a formal appeal of the denial of disability benefits required a written letter requesting review, inviting Dorsey to submit one if he wished to appeal the initial decision. Id. On December 14, 2009, Dorsey's attorney wrote to confirm his desire to appeal the June 5, 2009, decision denying his long-term disability claim. A.R. 368.

On December 14, 2009, Dorsey went to Cheryl Ludvik, a therapist, for counseling. A.R. 497–98. Ludvik observed that Dorsey presented with a worried facial expression, but neat dress and appearance. A.R. 498. She noted that his motor behavior was agitated, his speech was pressured, and his mood or affect was anxious. Id. Nevertheless, Ludvik observed that Dorsey was alert to time, person, place, and situation. Id. She characterized Dorsey's intellect as "average" and found his memory, impulse control, and judgment each to be "adequate." Id. Ludvik documented a diagnosis of general anxiety disorder, with a current GAF rating of 50, indicating serious symptoms or serious impairment in social or occupational functioning. A.R. 498; see also DSM-IV-TR, at 34.

20

On appeal, Aetna referred Dorsey's claim to a neurologist for a peer review. On January 11, 2010, Dr. Vaughn Cohan, M.D., a neurologist, completed an Aetna Physician Review report. A.R. 540–43. Based upon his review of Dorsey's medical records, Dr. Cohan concluded that the medical documentation failed to support functional impairment on the basis of any medical or neurologic disorder for the entire time period of September 15, 2008, to present. A.R. 541. In particular, Dr. Cohan noted:

> The claimant apparently has reported headaches, dizziness, fatigue, and sleep disorder. However, none of the medical documentation provided addresses those conditions other than to say that the claimant has tension headaches due to his chronic anxiety and depression. There are no clinical reports describing the claimant's neurologic and/or sleep history, and there are no clinical repots describing the claimant's relevant medical physical exam findings. Also no relevant laboratory documentation (brain imaging, electroencephalography, polysomnography) are submitted for review.

> In summary, it is my opinion that the documentation provided does not demonstrate objective evidence of a functional impairment for the claimant's own occupation on the basis of any medical or neurologic disorder. There is no indication of any impairment in the claimant's cognition or physical exam findings, and all of the documentation provided makes reference only to his behavioral health problems.

A.R. 542.

Dorsey's claim was simultaneously referred to a psychiatrist for a peer review. On January 13, 2010, Dr. Michael Silver, M.D., a psychiatrist, completed an Aetna Physician Review report. A.R. 544–46. Based upon his review of Dorsey's medical records, Dr. Silver likewise concluded that the documentation failed to support functional impairment on the basis of any psychiatric disorder for the entire time period of September 15, 2008, to present. A.R. 545. In particular, Dr. Silver noted:

> For the period from 9/15/08 through the present, it is my psychiatric opinion that there are insufficient functional examination findings in the documentation provided and in my peer-to-peer consultations with Dr. Balderston and nurse practitioner for Dr. Guanzon that establishes the

presence of a significant psychiatric or cognitive impairment that would preclude the claimant's ability to perform his own occupation. There is no evidence that the claimant presents with severe symptoms of psychiatric illness or cognitive deficits which were noted to adversely effect [sic] his work functioning in his own occupation. The claimant did not require inpatient psychiatric treatment from 9/15/08 through the present. There is no evidence that the claimant required psychiatric treatment in a structured outpatient psychiatric program during this period of time. In addition, there is evidence in the supplemental functional assessment from 11/18/09 that the claimant's panic attacks had decreased and that the claimant is psychiatrically improved.

A.R. 546.

On February 23, 2010, Dorsey went to Ms. Ludvik again for counseling. A.R. 499. In her treatment notes, Ms. Ludvik noted that Dorsey reported "still a lot of anxiety and stress over disability," but he "feels meds are helping." Id.

On March 1, 2010, Dr. Silver completed a supplemental Physician Review report. A.R. 534–39. Dr. Silver reviewed supplemental documentation in great detail. See A.R. 536–37. Based upon this review, Dr. Silver once again concluded that the documentation failed to support functional impairment on the basis of any psychiatric disorder for the entire time period of September 15, 2008, to present. A.R. 537. Dr. Silver's findings were substantively identical to the findings set forth in his January report, with the following additional findings:

There is evidence that the claimant sought out treatment with the primary care physician every two to three months only. There is evidence that the claimant only received psychiatric treatment every two to three months with some of the visits focused on the psychiatrist completing disability forms. There was no evidence of completed mental status examination nor any psychotropic treatment reported.

A.R. 538.

On May 12, 2010, Dorsey went to Dr. Guanzon for a routine visit. A.R. 511. Dorsey reported feeling "frustrated" and "disgusted" at receiving the "run-around" by Aetna. Id. Dorsey self-reported his mood as "tired" and "depressed." Id. No adjustments to his medication

or treatment were made. See id. Dr. Guanzon advised Dorsey to return for further treatment in two or three months, "as scheduled." Id.

On June 9, 2010, Dorsey went to Dr. Guanzon for a routine visit. A.R. 515. Dorsey complained of increased occurrences of numbness on his left arm. Id. Dorsey stated that he had already been cleared by Dr. Balderston two weeks ago after performing a cardiac stress test. Id. Dr. Guanzon instructed Dorsey to go back to his primary care physician—to make an appointment that very same day. Id. In the meantime, he was instructed to continue on his current medications, and Dr. Guanzon would await the results of his examination by his primary care physician. Id. Dorsey denied any suicidal ideation, stating that he was "just stressed out." Id.

Following Aetna's receipt of additional documentation, including Ms. Ludvik's treatment records in particular, Dorsey's claim was referred for yet another psychiatry peer review. On June 28, 2010, Dr. Eric M. Kaplan, M.D., a board-certified psychiatrist and neurologist, completed an Aetna Physician Review report. A.R. 522–27. Based upon a detailed review of supplemental medical records submitted by Dorsey's attorney, Dr. Kaplan concluded that the medical documentation failed to support functional impairment for the entire time period of June 5, 2009, to present. A.R. 525. In particular, Dr. Kaplan noted:

> While there is documentation of depressive and anxiety symptoms based on the claimant's subjective complaints, it is felt that the symptoms which the claimant complains about would not be occupational disabling and would not lead to restrictions and limitations in his ability to work on a full-time basis. This reviewer has treated thousands of patients with similar symptoms, and in my clinical experience, my patients are able to work while receiving treatment for these disorders. In summary, he has been diagnosed with panic disorder without agoraphobia, major depressive disorder, and attention deficit hyperactivity disorder. Please note attention deficit disorder is a diagnosis based on DSM-IV criteria which must occur by the age of six. Therefore, the claimant has worked and been educated on a long-term basis with the various symptoms of ADD. This diagnosis

and the symptoms which comprise this diagnosis would not be occupationally disabling. There is documentation of mild depressive symptoms based on the claimant's subjective complaints, and there is documentation of mild to moderate anxiety symptoms including panic attacks. There is no documentation of suicidal ideation, homicidal ideation, psychosis, mania or hypomania. There is no documentation of significant impairment in activities of daily living. In addition, there is no significant documentation of cognitive impairment.

A.R. 525–26.

On July 2, 2010, an Aetna appeals specialist wrote to Dorsey's attorney, denying his appeal from Aetna's June 5, 2009, decision denying Dorsey's claim for long-term disability benefits. A.R. 529–33. The letter reviewed the medical evidence of record in detail and adopted the findings of the four independent physician reviewers to whom Aetna had referred Dorsey's claim for review. See id.

### Procedural History

On February 22, 2012, Dorsey filed the complaint in this matter. Counts I, II, and III asserted claims for benefits and for declaratory judgment against Cox, as plan administrator, and Aetna, as third-party claims administrator, with respect to Dorsey's entitlement to long-term disability benefits. Count IV asserted various claims against Cox alone related to Dorsey's entitlement to benefits under the CESP, an unfunded deferred compensation plan for select management and highly compensated employees of Cox and its subsidiaries. On March 21, 2012, Aetna filed its answer and affirmative defenses to the complaint. On April 18, 2012, Cox filed its answer and affirmative defenses to the complaint.

### III. SUMMARY JUDGMENT STANDARD

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment should be granted only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" only if it might affect

the outcome of the case. Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986). In deciding a summary judgment motion, the Court must view the record as a whole and in the light most favorable to the nonmovant. Terry's Floor Fashions, Inc. v. Burlington Indus., Inc., 763 F.2d 604, 610 (4th Cir. 1985).

The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion," and demonstrating the absence of a genuine dispute of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). If the movant makes such a showing, the nonmovant must set forth specific facts, supported by the record, demonstrating that "the evidence presents a sufficient disagreement to require submission to the jury." Anderson, 477 U.S. at 251-52.

When confronted with cross-motions for summary judgment, "the standards upon which the court evaluates the motions for summary judgment do not change." Taft Broad. Co. v. United States, 929 F.2d 240, 248 (6th Cir. 1991). "[T]he Court must review each motion separately on its own merits 'to determine whether either of the parties deserves judgment as a matter of law.'" Rossignol v. Voorhaar, 316 F.3d 516, 523 (4th Cir. 2003) (quoting Philip Morris Inc. v. Harshbarger, 122 F.3d 58, 62 n.4 (1st Cir. 1977)). The mere fact that both sides have moved for summary judgment does not establish that no genuine dispute of material fact exists, thus requiring that judgment be granted to one side or the other. See Worldwide Rights Ltd. P'ship v. Combe Inc., 955 F.2d 242, 244 (4th Cir. 1992); Am. Fid. & Cas. Co. v. London & Edinburgh Ins. Co., 354 F.2d 214, 216 (4th Cir. 1965). Even if the basic facts are not in dispute, the parties may nevertheless disagree as to the inferences that reasonably may be drawn from them, in which case summary judgment may be inappropriate, necessitating the denial of both motions. See Am. Fid. & Cas. Co., 354 F.2d at 216.

# IV. ANALYSIS

## A. Long-Term Disability Benefits

### 1. The appropriate ERISA standard of review

An action for benefits brought under ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B), "is to be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989). "The plan administrator or fiduciary bears the burden of showing that the plan reserves discretionary authority to it so that the arbitrary and capricious standard can apply. The documents must convey a clear reservation of discretion to the plan administrator." Palmiotti v. Met. Life Ins. Co., 423 F. Supp. 23, 288, 297 (S.D.N.Y. 2006) (internal quotation marks omitted). Here, the plan gives Aetna discretionary authority. The plaintiff maintains that these documents are not the plan, but that a summary plan description is the plan.

"The burden of production imposed by Rule 56 requires the moving party to make a prima facie showing that it is entitled to summary judgment." Celotex Corp., 477 U.S. at 331. Aetna has submitted what it and Cox contend to be the operative plan documents as Attachment A to its motion for summary judgment. ECF No. 51 attach. 1. An identical copy of the very same set of documents has been submitted in support of the plaintiff's brief in opposition to Cox's motion for summary judgment. ECF No. 53 attach. 1, at 122–74. In a Rule 30(b)(6) deposition of Betsy Vencius, Cox's Assistant Vice President for Benefits, on September 13, 2012, she identified these documents as Cox's "active plan." Vencius Dep. 77, Sept. 13, 2012, ECF No. 58 attach. 1.

Attachment A is comprised of four separate documents: (1) the Cox Enterprises, Inc.

Welfare Benefit Plan, as amended and restated effective as of January 1, 2002; (2) a Booklet describing long-term disability coverage under the Plan, issued and effective January 1, 2002; (3) a Summary of Coverage further describing long-term disability coverage under the Plan, issued and effective January 1, 2005; and (4) a three-page document captioned "Additional Information Provided by Cox Enterprises, Inc.," disclosing certain additional information in compliance with ERISA. According to a statement in the "Additional Information" disclosure, taken together, the Booklet, the Summary of Coverage, and the Additional Information disclosure are intended constitute the Summary Plan Description required by ERISA.

Section 8.1(b) of the Cox Welfare Benefits Plan, as amended, provides that:

> [T]he Plan Administrator's powers will include, but will not be limited to, the following authority, in addition to all other powers provided by this Plan: . . . Except as provided in an administrative services contract or contracts between the Company . . . and the Claims Administrator, to interpret the Plan, its interpretation thereof, to be final and conclusive on all persons claiming Benefits under the Plan . . . .

Cox Welfare Benefit Plan § 8.1(b) (Jan. 1, 2002) & Amend. No. 2 ¶ 5 (Jan. 1, 2007), ECF No. 51 attach. 1, at 19, 35.

As contemplated in the Welfare Benefits Plan, Cox and Aetna have entered into an Administrative Services Contract, effective January 1, 1990, under which Aetna agreed to serve as a third-party claims administrator for various employee benefit plans established by Cox for its employees. The Administrative Services Contract, submitted by Aetna as Attachment B to its motion for summary judgment, provides that:

> [Cox] hereby delegates to AEtna authority to make determinations on behalf of [Cox] with respect to benefit payments under the Plan and to pay such benefits. In connection with such determinations, AEtna acknowleges [sic] that it is acting as fiduciary solely for benefit determination, benefit processing, and review, and appeals of claims for benefits under [ERISA]. For the purposes of ERISA . . . [Cox] shall, however, be deemed the administrator of the Plan.

Administrative Services Contract No. ASC-50398, at § 5(a) (eff. Jan. 1, 1990), ECF No. 51

attach. 2, at 9. An addendum to the Administrative Services Contract further provides that:

> [AEtna] is hereby designated as the Named Fiduciary under the Cox
> Enterprises Group Insurance Plans ("Plan") with complete authority to
> review all denied claims for benefits under the [Administrative Services
> Contract] (including but not limited to the denial of certification of the
> medical necessity of hospital or medical treatment). In exercising its
> fiduciary responsibility, AEtna shall have the discretionary authority to
> determine, subject to the terms of the Plan, whether and to what extent
> participants and beneficiaries are entitled to benefits, and to construe
> disputes or doubtful Plan terms. AEtna shall be deemed to have properly
> exercised such authority unless it has abused its discretion hereunder by
> acting arbitrarily and capriciously.

Addendum to Administrative Services Contract No. ASC-50398 (Jan. 10, 1990), ECF No. 51

attach. 2, at 19.

The foregoing provisions in the Cox Welfare Benefits Plan and the accompanying

Administrative Services Contract with Aetna clearly provide discretion to the plan administrator

or fiduciary with respect to determining benefit eligibility and construing Plan terms. Thus the

discretionary authority to determine long-term disability benefits is with Aetna.

The plaintiff, however, argues that there is a dispute of material fact as to whether the

Attachment A constitutes the operative plan with respect to long-term disability benefits. The

plaintiff seemingly contends that the Summary Plan Description documents alone, which do not

contain any language reserving discretion to the plan administrator or fiduciary, comprise the

operative plan with respect to long-term disability benefits, and that the Cox Welfare Benefit

Plan is, by its terms, a distinct and separate plan from the long-term disability plan at issue in this

case. In particular, the plaintiff points to a passage in the Cox Welfare Benefit Plan that states:

"A Participant who is receiving benefits under the long term disability program offered by the

Company . . . will continue to be eligible to participate in this Plan in accordance with the terms

of the applicable Programs." Cox Welfare Benefit Plan § 7.5. The plaintiff argues that this

language distinguishes the Cox Welfare Benefit Plan from a separate long-term disability benefits plan.[5]

But the Cox Welfare Benefits Plan, by its terms, contemplates that the Plan itself is comprised of various benefits programs detailed in separate supplements to the Plan. See id. §§ 1.3, 2.26. The language cited by the plaintiff simply provides that a participant who receives benefits under the long-term disability program offered by Cox will remain eligible to continue to participate in the Plan, despite no longer qualifying as a "regular, full time Employee" of Cox. See id. §§ 2.12, 3.1. Moreover, the Summary Plan Description, upon which the plaintiff would prefer the Court to solely rely, contains language further confirming that the long-term disability program does not itself constitute the entire Plan. See Plan Booklet 8, ECF No. 51 attach. 1, at 43 ("A person's coverage under the Long Term Disability Coverage section of this Plan replaces and supersedes any prior like coverage."); id. at 10, ECF No. 51 attach. 1, at 45 ("This document describes the main features of this Plan. Additional provisions are described elsewhere in the Plan Document on file with your Employer.").

Finally, the Court notes that the plaintiff is unable to identify a plausible alternative to the plan documents identified by the defendants. In fact, the plaintiff relies on the plan to provide his long-term disability benefits through a decision by Aetna, which he desires to reverse. The plaintiff does not explicitly claim that the Summary Plan Description documents constitute the entire operative plan with respect to long-term disability benefits, but he implicitly does so by

---

[5] The Court notes that the plaintiff has also flagged a discrepancy between several versions of the Plan Booklet produced in discovery. The plaintiff has commented in his briefs that the Booklet provided to Dorsey's attorneys during the administrative process differs from the one produced by Cox and Aetna in discovery, but, as acknowledged by his counsel at hearing on these cross-motions for summary judgment, there is no material difference between the three versions of the Booklet for the purpose of this litigation. All three contain the same "own occupation" definition for total disability, and all three contain the same language quoted by the Court in the next paragraph.

denying the applicability of the Cox Welfare Benefit Plan document and arguing that the defendants have failed to meet their burden of showing that the plan reserves discretionary authority to the plan administrator or fiduciary. "[S]ummary documents, as important as they are, provide communication with beneficiaries about the plan, but . . . their statements do not themselves constitute the terms of the plan for purposes of § 502(a)(1)(B)." Cigna Corp. v. Amara, 131 S. Ct. 1866, 1878 (2011). "The terms of an ERISA plan must be 'established and maintained pursuant to a written instrument.'" Shoop v. Life Ins. Co. of N. Am., 839 F. Supp. 2d 830, 837 (E.D. Va. 2011) (quoting 29 U.S.C. § 1102(a)(1)). Under ERISA § 402, that written instrument must in turn: (1) provide for one or more named fiduciaries; (2) provide a procedure establishing and carrying out a funding policy and method consistent with the objectives of the plan and ERISA's fiduciary responsibility provisions; (3) describe the procedure for allocation of responsibilities for the operation and administration of the plan; (4) provide a procedure for amendment of the plan; and (5) specify the basis on which payments are made to and from the plan. 29 U.S.C. § 1102(a), (b).

> "[A]n employee benefit plan under ERISA can be comprised of more than one document." A plan may incorporate other formal or informal documents, such as a collective bargaining agreement or a certificate of insurance. Moreover, "there is no requirement that documents claimed to "collectively form the employee benefit plan be formally labeled as such.

Gonzales v. Unum Life Ins. Co. of Am., 861 F. Supp. 2d 1099, 1107–08 (S.D. Cal. 2012) (quoting other sources, alteration in original). The plan documents identified by the defendants as "the Plan" comply with the requirements of Section 402 (the Summary Plan Description, upon which alone the plaintiff would prefer to proceed, simply does not).

Having considered the evidence of record in the light most favorable to the plaintiff, it is clear that the plan documents submitted by the defendants are the operative plan documents with respect to Dorsey's claim. Moreover, a "summary" generally summarizes something, and is not

the entire matter. The Plan clearly reserves discretionary authority with respect to long-term disability benefits to the plan administrator or fiduciary, and, accordingly, the Court must review the claims administrator's decision to deny Dorsey's claim for long-term disability benefits under an abuse-of-discretion standard.

### 2. Whether Aetna abused its discretion in denying the plaintiff's claim for benefits

When reviewing the discretionary decision of a plan administrator to deny employee benefits, judicial review is limited to the body of evidence before the administrator at the time it rejected the claim. Elliot v. Sara Lee Corp., 190 F.3d 601, 608–09 (4th Cir. 1999). A plan administrator's decision will not be disturbed if it "is the result of a deliberate, principled reasoning process and if it is supported by substantial evidence." Brogan v. Holland, 105 F.3d 158, 161 (4th Cir. 1997). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001). In consists of "more than a mere scintilla of evidence but somewhat less than a preponderance." Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966).

In essence, Dorsey claims that the symptoms of his anxiety and depressive disorders, and the side-effects of medications prescribed to treat those disorders, impair his ability to function to such that he is totally disabled from performing his own occupation. See A.R. 364 (Dorsey Aff. ¶¶15–16, Dec. 1, 2009 ("Due to my condition and the side effects of my medication, I experience difficulty concentrating on specific tasks, and difficulty focusing on tasks which require mental acuity on a daily basis. . . . I also experience repeated difficulty with wakefulness which causes reduced energy levels on a daily basis.")). In support of his application for benefits, Dorsey submitted treatment records and standardized assessment forms from his primary care physician, his psychiatrist, and his therapist, all of which indicate a primary diagnosis of generalized

anxiety disorder and major depressive disorder, with a secondary diagnosis of attention-deficit disorder.

On administrative review of Dorsey's application for benefits, Aetna, the plan fiduciary, referred his case to four separate independent physicians for review and assessment of the medical evidence submitted in support of his application. In their detailed reports, Doctors Mendelssohn, Cohan, Silver, and Kaplan each separately concluded that the medical documentation failed to support functional impairment that would support a finding that Dorsey was disabled from performing his own occupation. As each of these reviewers noted, the plaintiff's medical records contained no specific objective findings to establish any impairment in Dorsey's physical, cognitive, emotional, or behavioral functioning during the time period of September 15, 2008, through March 3, 2009. Although Dr. Mendelssohn found support for the presence of a functional impairment commencing March 4, 2009, each of the other three reviewers found insufficient objective evidence to establish a functional impairment at any point. Based on the opinions of these independent physician reviewers, Aetna denied Dorsey's application for long-term disability benefits, both initially and on administrative appeal.

In reviewing the administrative history of this case, it is clear that Aetna's denial of Dorsey's application was "the result of a deliberate, principled reasoning process." See Brogan, 105 F.3d at 161. The plan fiduciary appears to have gone to great lengths to consider all of the medical evidence provided by Dorsey and his attorneys, and it engaged the services of not one, but four separate independent physicians to review and assess Dorsey's case.

It is also clear from the administrative record that Aetna's decision was supported by substantial evidence, or "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." See Mastro, 270 F.3d at 176. As noted by each of the four

independent reviewers, the diagnoses of Doctors Guanzon, Balderston, and Zhang relied predominantly, if not exclusively, on the subjective complaints of the plaintiff, with little or no objective evidence to indicate any functional impairment that would prevent Dorsey from performing at his own occupation. When Dorsey's psychiatrist did assess Dorsey's functional abilities and limitations, she concluded that he was disabled from working despite assessing his current GAF rating as a 60 at that time, which rating indicated no more than moderate functional impairment. See A.R. 259. In November 2009, Dr. Guanzon performed another full assessment of Dorsey's functional abilities and impairments, again finding him totally disabled from working, but noting nonetheless that Dorsey had responded well to treatment and he had experienced a decrease in panic attacks. See A.R. 358. The Court finds the opinion of Dr. Kaplan to be particularly persuasive, both in its comprehensive analysis of the medical evidence of record and in its reference to Dr. Kaplan's clinical experience, lending much needed context to the severity of Dorsey's symptoms. See A.R. 525–26 ("This reviewer has treated thousands of patients with similar symptoms, and in my clinical experience, my patients are able to work while receiving treatment for these disorders.").

Accordingly, the Court finds that the decision to deny Dorsey's application for long-term disability benefits was the result of a deliberate, principled reasoning process, and it was supported by substantial evidence.

### B. Failure to Disclose Cox Executive Supplemental Plan Documents

In Count IV of the Complaint, the plaintiff asserts a claim against Cox for civil monetary penalties as a result of Cox's failure to timely disclose a complete copy of the Cox Executive Supplemental Plan.

Section 104(b)(4) of ERISA requires that a plan administrator must, "upon written

request of any participant or beneficiary, furnish a copy of the latest updated summary plan description . . . and the latest annual report, any terminal report, the bargaining agreement, trust agreement, contract, or other instruments under which the plan is established or operated." 29 U.S.C. § 1024(b)(4). Section 502(c)(1) of ERISA establishes a private cause of action for civil penalties with respect to a plan administrator's failure to comply with this disclosure obligation, providing that:

> Any administrator . . . who fails or refuses to comply with a request for any information which such administrator is required by this subchapter to furnish to a participant or beneficiary . . . within 30 days after such request may in the court's discretion be personally liable to such participant or beneficiary in the amount of up to $100 a day from the date of such failure or refusal, and the court may in its discretion order such other relief as it deems proper.

29 U.S.C. § 1132(c)(1)(B). By regulation, the amount of civil penalties available under Section 502(c)(1) has been increased to $110 per day. 29 C.F.R. § 2575.502c-1.

Dorsey first requested a copy of the CESP in March 2007. Dorsey Dep. 102–04. He made this request verbally over the phone to Deborah Anne Thomas, who at the time was Vice President for Human Resources at Cox AutoTrader, Inc., in Atlanta. Id.; Thomas Dep. 12. Thomas informed Dorsey that the CESP had not yet been amended to reflect the addition of Dorsey and other former Trader executives. Dorsey Dep. 104. Dorsey requested a copy of the CESP for the second time in September 2007, again making a verbal request over the phone to Thomas. Id. at 105–06. Once again, Thomas informed Dorsey that the necessary amendments to the CESP had not yet been completed. Id. at 106. Dorsey made his third and final verbal request for a copy of the CESP in December 2007, again over the phone to Thomas in Atlanta. Id. at 107. Thomas advised Dorsey that the amended CESP was still not completed. Id. Dorsey himself made no further requests for a copy of the CESP. Id. at 108.

Through his attorney, Dorsey made a written request for the CESP plan documents on

November 4, 2009. Dorsey Dep. Ex. 15. On November 25, 2009, Thomas Martinchek, an in-house attorney at Cox, forwarded a copy of the CESP to Sullivan by e-mail. Dorsey Dep. Ex. 16. The copy furnished, however, did not include Exhibit A to the CESP, which set forth a list of grandfathered newspaper executives entitled to certain benefits under CESP. That exhibit was not disclosed to the plaintiff until September 27, 2012. See Sullivan Aff. & Attachs., Oct. 16, 2012, ECF No. 53 attach. 3. Thus Dorsey now claims that Cox failed to meet its statutory disclosure obligations until it furnished Dorsey with a complete copy of the CESP, including the exhibit pertaining to grandfathered newspaper executives, on September 27, 2012, almost three years after Dorsey's written request for plan documents, and more than five years after his initial verbal request.

Section 104(b)(4) of ERISA explicitly requires that a request must be in writing as a condition precedent to a pension plan administrator's obligation to disclose plan instruments. See 29 U.S.C. § 1024(b)(4); Graham v. Pactiv Corp. Benefits Comm., 301 F. Supp. 2d 483, 497 (E.D. Va. 2004) ("The disclosure provisions contained in [Section 104(b)(4)], however, are only triggered upon a 'written request.'"); Colarusso v. Transcapital Fiscal Sys., Inc., 227 F. Supp. 2d 243, 257–58 (D.N.J. 2002); Meyer v. Phillip Morris, Inc., 569 F. Supp. 1510, 1511 (E.D. Mo. 1983).[6] Dorsey's requests to Thomas in 2007 were all verbal, not written, and thus did not trigger a disclosure obligation under the statute. See Graham, 301 F. Supp. 2d at 497.

---

[6] The plaintiff argues that, despite the express language of the statute, courts have held a verbal request to be sufficient, citing Crotty v. Cook, 121 F.3d 541 (9th Cir. 1997). But unlike the plan instrument at issue in this case, requested pursuant to Section 104(b)(4), Crotty concerned a plan administrator's failure to furnish a participant with a summary plan description, which the plan administrator was obligated to disclose automatically, without a written request, pursuant to Section 104(b)(1) of ERISA. See Colarusso, 227 F. Supp. 2d at 257–58 (distinguishing Crotty and finding a verbal request insufficient to trigger disclosure obligations under Section 104(b)(4)).

The November 4, 2009, request by Dorsey's attorney, however, was made in writing.[7] While the main body of the CESP was timely disclosed to Dorsey on November 25, 2009, the plaintiff did not receive a complete copy of the CESP until Exhibit A was furnished to him on September 27, 2012, nearly three years after his initial written request. As a result, the plaintiff claims he is entitled to more than $100,000 in civil penalties under Section 502(c)(1) of ERISA.

Cox contends, however, that the CESP is exempt from the disclosure obligations imposed by Section 104(b) of ERISA as a so-called "top hat" plan.[8] Top hat plans are a "rare sub-species" of ERISA plans "specifically exempted from ERISA's participation, vesting, funding, and fiduciary requirements." Guiragoss v. Khoury, 444 F. Supp. 2d 649, 658 (E.D. Va. 2006). Although ERISA does not exempt top hat plans from compliance with its reporting and disclosure provisions altogether, id. at 658 n.10, Section 110 of ERISA authorizes the Secretary of Labor to prescribe alternative methods of compliance by administrative regulation. 29 U.S.C. § 1030; see also In re New Valley Corp., 89 F.3d 143, 149 (3d Cir. 1996) (top hat plans are exempted from "ERISA's reporting and disclosure requirements upon promulgation of the proper administrative regulations"). Pursuant to this authority, the Secretary has promulgated a regulation which imposes only minimal reporting requirements with respect to top hat plans, and no obligation whatsoever to disclose plan instruments to participants or beneficiaries. See 29

---

[7] As this Court has previously observed, "a request from a participant's lawyer, as opposed to one from the participant himself, is sufficient to trigger the statutory penalties of [Section 502(c)(1)]." Graham, 301 F. Supp. 2d at 496 n.20.

[8] Cox also argues that Dorsey is not entitled to recover civil penalties for violation of ERISA disclosure obligations because he has not established prejudice. But "prejudice to the party requesting the documents is not a prerequisite to the imposition of penalties" under Section 502(c)(1) of ERISA. Faircloth v. Lundy Packing Co., 91 F.3d 648, 659 (4th Cir. 1996). It is merely a factor that may be considered by a district court in deciding what penalty to impose for a plan administrator's failure to comply with ERISA disclosure requirements. See id.; see also Middlebrooks v. Godwin Corp., No. 1:10-cv-1306, 2012 WL 405080, at *6–*7 (E.D. Va. Feb. 7, 2012) (imposing $500 penalty in the absence of bad faith or prejudice).

C.F.R. § 2520.104-23; see also Demery v. Extebank Deferred Compensation Plan (B), 216 F.3d 283, 290 (2d Cir. 2000) ("[A] top hat plan is deemed to have satisfied the reporting and disclosure requirements of ERISA . . . by filing a short statement with the Secretary of Labor and providing plan documents to the Secretary upon request.").

A top hat plan is "a plan which is unfunded and is maintained by an employer primarily for the purpose of providing deferred compensation for a select group of management or highly compensated employees." 29 U.S.C. § 1101(a)(1); Davis v. Old Dominion Tobacco Co., Inc., 755 F. Supp. 2d 682, 703–04 (E.D. Va. 2010). In addition to these two statutory elements, this Court has recognized a third requirement: "that employees participating in the alleged top hat plan have sufficient influence within the company to negotiate compensation agreements that will protect their interests where ERISA provisions do not apply." Id. at 704.

There is no dispute with respect to the explicit statutory elements. Based on the terms of the plan instrument itself, the CESP is an unfunded plan. See Cox Executive Supplemental Plan § 10.4 (eff. Jan. 1, 2005) ("Any person who claims a retirement benefit under the CESP shall look solely to the general assets of the Participating Employer obligated to make such payment . . . ."), ECF No. 46 attach. 30. The plan instrument also clearly and unambiguously states that the primary purpose of the CESP is to provide deferred compensation for a select group of highly compensated executives.[9] Cox Executive Supplemental Plan pmbl. ("The primary purpose of the CESP is to provide supplemental pension benefits for a select group of management employees and their dependents."); see also Vencius Decl. ¶ 4, Oct. 19, 2012, ECF

---

[9] The plaintiff quibbles that the CESP provides certain welfare benefits, not just deferred compensation, for select executives (for example, medical reimbursement benefits for certain former newspaper executives). But the statute requires only that the plan be maintained primarily for the purpose of providing deferred compensation, not that the plan must provide deferred compensation exclusively.

No. 54 attach. 3. Indeed, Cox and its subsidiaries have annual revenues approaching $15 billion and more than 50,000 employees throughout the United States and several foreign countries. Out of these many thousands of Cox employees, only fifty-five executive management or highly compensated individuals are current participants in the CESP. Vencius Decl. ¶ 4. As CFO of CATAM and the highest ranking executive in its Norfolk headquarters, which was the main office of the company, Dorsey was among this very select group of top Cox executives until his termination. See generally Guiragoss, 444 F. Supp. 2d at 663 (recognizing 15.34% of an employer's workforce as the upper limit of the acceptable size for a "select group" of participants in a top hat plan); Godina v. Resinall Int'l, Inc., 677 F. Supp. 2d 560, 574 (D. Conn. 2009) (finding plan covering seven of 300 employees, or 2.3% of workforce, was a top hat plan); Fishman v. Zurich Am. Ins. Co., 539 F. Supp. 2d 1036, 1046 (N.D. Ill. 2008) (finding limited group of less than 1% out of thousands of employees was quantitatively "select"). The plaintiff himself has admitted to understanding that the CESP, much like the Trader SERP, is an unfunded deferred compensation plan for highly compensated executives. Dorsey Dep. 109–10. Taken together, these facts are also sufficient to meet Cox's prima facie burden with respect to the third element, "that employees participating in the alleged top hat plan have sufficient influence within the company to negotiate compensation agreements that will protect their interests where ERISA provisions do not apply," Davis, 755 F. Supp. 2d at 704, and Dorsey has failed to "proffer[] either direct or circumstantial evidence suggesting an absence of bargaining power sufficient to raise a question of fact on this issue." See Demery, 216 F.3d at 289.

Having considered the evidence of record in the light most favorable to the plaintiff, the Court is compelled to conclude that the CESP is a top hat plan and thus exempt from the disclosure obligations imposed by Section 104(b)(4) of ERISA. Accordingly, as a matter of law,

there is no statutory basis for the plaintiff's claim against Cox for civil monetary penalties pursuant to Section 502(c)(1) of ERISA.

### C. Cox Executive Supplemental Plan Benefits

In Count IV of the Complaint, the plaintiff asserted several different claims for relief related to the CESP and the Trader SERP. In addition to his claim for civil monetary penalties for failure to timely disclose a complete copy of the CESP, the plaintiff sought an award of short-term disability benefits for the three-month period following his termination and declaratory judgment with respect to: (1) his eligibility for certain disability retirement benefits provided under the CESP or, alternatively, the Trader SERP; (2) his eligibility for a $5,000 annual medical reimbursement benefit provided to certain participants under the CESP; (3) the validity of a waiver of entitlement to benefits under the Trader SERP executed by the plaintiff as a precondition to his participation in the CESP; and (4) his entitlement to additional service-year credits, based on any period of disability, for pension benefit calculation purposes. By the time of summary judgment proceedings in this case, the plaintiff had abandoned each of these claims other than his nondisclosure claim. See generally Pl.'s Stipulation as to Remedies, ECF No. 65.

In his response to Cox's motion for summary judgment, the plaintiff has asserted an entirely new claim for declaratory judgment with respect to his entitlement to "identical" benefits under the CESP as those to which he was entitled under the Trader SERP—specifically, that he is entitled to have the option to elect to receive payment of his retirement annuity under the CESP in the form of a single lifetime annuity with 120 monthly payments guaranteed. See Pl.'s Opp'n Br. 15–18, ECF No. 53; see also Pl.'s Stipulation as to Remedies, ECF No. 65. But "a plaintiff may not raise a new theory of liability for the first time, after the close of discovery, in his opposition to summary judgment without amending his complaint." United States ex rel.

DRC, Inc. v. Custer Battles, LLC, 472 F. Supp. 2d 787, 796 n.11 (E.D. Va. 2007) (quoting Matthews v. Xerox Corp., 319 F. Supp. 2d 1166, 1172 (S.D. Cal. 2004)); see also Cloaninger v. McDevitt, 555 F.3d 324, 336 (4th Cir. 2009) ("[A] plaintiff may not raise new claims after discovery has begun without amending his complaint."). To allow the plaintiff to effect a constructive amendment of the complaint on summary judgment, well after the close of discovery, "would seriously undermine the fairness of the litigation and unfairly prejudice" defendant Cox.[10] Custer Battles, 472 F. Supp. 2d at 795–96.

Even if the Court were to permit amendment of the complaint at this late date, the plaintiff's new claim is nevertheless meritless. The plaintiff appears to assert this new claim on an equitable estoppel theory of liability. "To establish a claim for equitable estoppel under ERISA, a plaintiff must prove: (1) a material representation, (2) reasonable and detrimental reliance upon the representation, and (3) extraordinary circumstances." New Valley, 89 F.3d at 153; see also Cigna Corp. v. Amara, 131 S. Ct. 1866, 1881 (2011) ("[W]hen a court exercises its authority under [ERISA] § 502(a)(3) to impose a remedy equivalent to estoppel, a showing of detrimental reliance must be made."). Having been raised for the first time at the summary judgment briefing stage, the facts supporting this new claim are not well developed in the record. But what evidence does exist in the record before the Court demonstrates a lack of reasonable and detrimental reliance on Dorsey's part, and the absence of any extraordinary circumstances

---

[10] The Court notes that the Federal Rules permit "an issue not raised by the pleadings" to be "treated in all respects as if raised in the pleadings," but only when "tried by the parties' express or implied consent." Fed. R. Civ. P. 15(b)(2). In this case, Cox has explicitly refused to consent, objecting in its reply brief to the plaintiff's introduction of this new claim in opposition to Cox's summary judgment motion. The reply brief addresses the new claim on its merits as well, but "[w]hen a party responds to an attempt to constructively amend a complaint at the summary judgment stage . . . , that response is essentially made under protest and does not rise to the level of 'impliedly consenting' to the [new] claim being tried." Taylor v. Mills, --- F. Supp. 2d ----, 2012 WL 4336236, at *9 (D.D.C. Sept. 24, 2012) (alterations in original omitted).

that might justify exercise of the Court's equitable power in this instance.

The plaintiff contends that the reorganization agreement through which the assets of Trader Publishing Company were divided between Landmark and Cox explicitly promised that the CESP would be amended to provide Dorsey and other former Trader executives with "identical" benefits to those previously provided to them under the Trader SERP. See Agreement and Plan of Reorganization (Division of Trader Publishing Company Assets) art. 6.4(c)(iii) (Sept. 10, 2006), ECF No. 46 attach. 32. Dorsey further contends that he and the other former Trader executives were also required to sign a Waiver that explicitly recited in its preamble that "Cox has agreed to amend the [CESP] to provide for the Former Executive to participate in the CESP with benefits that initially are identical to the benefits, vested or not, that the Former Executive was entitled to receive under the [Trader] SERP." See Dorsey Dep. Ex. 17. But the text of the CESP, as interpreted by the plaintiff, explicitly excludes former Trader executives from electing a particular form of annuity that they were previously permitted to elect under the Trader SERP—namely, a single lifetime annuity with 120 monthly payments guaranteed. See Cox Executive Supplemental Plan § 8.1(c); see also id. § 2.2(b).

The representation embodied in the waiver was simply that Cox had agreed to amend the CESP, and, based on the text of the reorganization agreement, this was not a misrepresentation as Cox had actually agreed to do so. The plaintiff's complaint, then, is that Cox failed to fulfill a promise made in the reorganization agreement. But any promise by Cox that it would amend the CESP was illusory at best. Although Cox promised to amend the CESP to provide former Trader executives with "identical" benefits to those they previously enjoyed under the Trader SERP, the very next sentence of the reorganization agreement provided that, "[n]otwithstanding the foregoing, as of any time after the Closing Date, Cox shall be permitted to make any changes

41

in the benefit entitlements of the Rehired Employees under the CESP as Cox, in its sole discretion, deems appropriate."[11] Agreement and Plan of Reorganization (Division of Trader Publishing Company Assets) art. 6.4(c)(iii) (emphasis added). The language of the waiver signed by Dorsey implicitly acknowledged the illusory nature of this promise, noting that Cox had agreed to amend the CESP to provide former Trader executives with "benefits that initially are identical to the benefits" they previously enjoyed under the Trader SERP. Dorsey Dep. Ex. 17 (emphasis added). "Simply failing to live up to written or oral assurances does not constitute the requisite extraordinary circumstances" to justify equitable estoppel under ERISA. See Sullivan v. Monsanto Co., 615 F. Supp. 2d 469, 473 (E.D. La. 2009). Nor could Dorsey have reasonably relied upon a promise that the CESP would permit him to elect a particular form of retirement annuity payment when Cox retained sole discretion to amend the plan at any time, and Dorsey's written waiver acknowledged the same.

Moreover, Dorsey has failed to identify any facts to establish his detrimental reliance on Cox's alleged misrepresentation. To show detriment, a plaintiff must demonstrate that "the defendant's statement 'in truth, influenced the conduct of' the plaintiff, causing 'prejudic[e].'" Cigna, 131 S. Ct. at 1881 (quoting another source) (alteration in original); see also Pearson v. Voith Paper Rolls, Inc., 656 F.3d 504, 511 (7th Cir. 2011) ("[D]etrimental reliance in the ERISA context requires a showing of economic harm."); Pell v. E.I. DuPont de Nemours & Co. Inc., 539 F.3d 292, 303 (3d Cir. 2008) ("In order to show detriment, or injury, a plaintiff must demonstrate that he relied upon the employer's representations in such a way that later led to injury."). But Dorsey has not yet applied for pension benefits under the CESP. Dorsey Dep. 199–200. Nor has

---

[11] Moreover, the reorganization agreement expressly disclaimed the creation of any third-party beneficiary rights. See Agreement and Plan of Reorganization (Division of Trader Publishing Company Assets) art. 8.16.

he yet decided what payment option he will elect upon retirement, although he believes it "[m]ore than likely" that he will select the joint and 50% surviving spouse lifetime annuity option rather than the single lifetime annuity with 120 monthly payments guaranteed option. Id. at 201. Indeed, Dorsey has failed to identify any prejudice or injury whatsoever as a result of the alleged misrepresentation.

Finally, the Court notes that a plan participant must exhaust his administrative remedies before filing suit under ERISA. See Smith v. Sydnor, 184 F.3d 356, 361–62 (4th Cir. 1999); Makar v. Health Care Corp. of the Mid-Atlantic (CareFirst), 872 F.2d 80, 83 (4th Cir. 1989). This is true even with respect to a claim for benefits under a top hat plan. Crowell v. Shell Oil Co., 481 F. Supp. 2d 797, 807–808 (S.D. Tex. 2007) (quoting Makar, 872 F.2d at 83). "In short, Congress intended plan fiduciaries, not the federal courts, to have primary responsibility for claims processing." Makar, 872 F.2d at 83. The facts presented well-illustrate the reason for this administrative exhaustion rule. According to the declaration of Betsy Vencius, Cox's Assistant Vice President for Benefits, Article 6.4(c)(iii) of the CESP has been interpreted by the plan administrator as excluding former Trader executives only from electing a single lifetime annuity with 60 monthly payments guaranteed, an option given to certain other Cox executives based on one available to them under a predecessor top hat plan. Vencius Decl. ¶¶ 6–7, Oct. 19, 2012, ECF No. 54 attach. 3. According to Vencius, this provision has been consistently interpreted and applied in that fashion by Cox as plan administrator, with each of the four former Trader executives who have reached retirement age being offered a 120-month guaranteed payment option upon applying for retirement. Id. ¶ 6. One of these four former Trader executives has elected and is currently receiving the single lifetime annuity with 120 monthly payments guaranteed. Id. Dorsey has adduced no evidence in rebuttal.

For all of these reasons, the Court declines to permit the plaintiff to constructively amend his complaint to assert a new equitable estoppel claim with respect to the availability to Dorsey and other former Trader executives of an option to elect to receive CESP retirement benefits in the form of a single lifetime annuity with 120 monthly payments guaranteed.

## V. CONCLUSION

For the foregoing reasons, the Court **ORDERS** that the defendants' respective motions for summary judgment are **GRANTED** and the plaintiff's motion for partial summary judgment is **DENIED**. The Clerk is **DIRECTED** to enter judgment in favor of the defendants and against the plaintiff in this case.

**IT IS SO ORDERED.**

March 26, 2013
Norfolk, Virginia

/s/
Robert G. Doumar
Senior United States District Judge